IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
SOUTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, )<br>)<br>Plaintiff, )<br>v. )<br>)<br>RONALD BRYANT, NIKKI MILLSAP, and )<br>DAWN PARENTEAU, )<br>)<br>Defendants. ) | Criminal Action<br>No. 08-03105-05/08/09-CR-S-DGK |

**REPORT AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE**

Pursuant to 28 U.S.C. § 636(b), the above-styled criminal action was referred to the undersigned for preliminary review. This matter comes before the Court on defendants' Motions to Suppress Evidence. The government has responded.

A hearing was held before the undersigned on October 16, 2009. Defendant Ronald Bryant was present with counsel, Stacie Bilyeu; defendant Nikki Millsap was present with counsel, Stuart Huffman; and defendant Dawn Parenteau was present with counsel, David Healy. The government was represented by Gary Milligan, Assistant United States Attorney.

Defendants assert that the wire tap interceptions in this case were issued without a showing of necessity as required by 18 U.S.C. §§ 2510 et seq., and § 2518(1)( c), as well as the Fourth and Fourteenth Amendments to the United States Constitution. It is argued that the evidence obtained as a result of the wire tap interceptions, and the fruit thereof, was obtained unlawfully, and that all such evidence should be suppressed.

The government proffered that Agent Mark Hooten, the affiant in this case, was

1

consulting with the U. S. Attorney's Office prior to preparing the affidavit seeking the wire tap interceptions; that the Office had spoken with the Department of Justice, which had approved, via a letter and certificate, permission to seek the wire taps; that Agent Hooten was made aware of his; that he went before the District Court Judge, swore to the facts in front of the judge, and was present when the judge signed the warrant; and that he relied in good faith on the issuance of the warrant by the District Court Judge.

On cross examination by counsel for defendant Bryant, Agent Hooten testified that the investigation began in November of 2007 for the Drug Enforcement Administration ["DEA"]. There was a prior investigation of Jason Clark being conducted by the COMET Drug Task Force and other agencies. That case was closed, and the DEA began its own investigation in late 2007. As far as he knows, there was no IRS investigation going on at the time for Jason Clark or any of the other individuals in the indictment. When he began his investigation, it started with his office. He applied for the wiretap in June of 2008. When they began the investigation, they had a confidential source who was providing information on Jason Clark and several other individuals. They were also using surveillance, and had used the confidential source to make a small purchase of methamphetamine from Clark. They first made contact with the confidential source in October or November of 2007. The source contacted them, and they immediately began investigating Jason Clark.

In his affidavit, Agent Hooten testified that he set out the normal investigative techniques that could be employed prior to applying for the wiretap. These include tools like purchasing drugs through a confidential source; using an undercover officer to buy narcotics; using physical surveillance; and trash runs, pen registers, search warrants, and interviews. In the affidavit,

2

Agent Hooten stated that the normal investigative techniques he employed, prior to obtaining the wiretap, failed to "fully" achieve the objectives of the investigation. [Tr. 8]. The officer testified that he made this statement because "[e]verything we tried in this case funneled down to one person and one person only and that was Jason Clark." [Id.]. The DEA could not obtain sufficient information about other individuals to present the case for an indictment. Prior to the wiretap, the only person they could have indicted was Jason Clark, and because of the small amount of methamphetamine purchased in the controlled buy, they probably could not have indicted him federally. Regarding physical surveillance, one of the problems was that they could not get close enough to overhear a conversation; in other words, they could not get within "earshot" of a target conducting a drug deal. [Tr. 10]. He agreed that this is almost always true in any drug case. Additionally, he stated in the affidavit that physical surveillance was hampered because meetings between drug dealers were arranged over the telephone, and they couldn't overhear them. The officer acknowledged that this is usually true in all drug cases. Regarding the drug deals taking place inside buildings and in parking lots, he agreed also, that this is not unusual. Agent Hooten agreed that there is nothing unique in this case about the problems with physical surveillance. It was his testimony that the DEA could have used pole cameras or neighbors' residences, but they don't often use them or get valuable information from them. This is true of most drug cases. Regarding tracking devices, Agent Hooten indicated in the affidavit that defendant Jason Clark used several vehicles, which hindered the use of such devices. At the hearing, he testified that they only had a couple of tracking devices, and that Clark had multiple vehicles. Because they never knew which vehicle he would use, and because they have to change the batteries often, it would be too dangerous to use tracking devices, even if

3

they had enough. He agreed that they are not used in the majority of cases. Agent Hooten also testified that physical surveillance was hard in this case because Jason Clark lived on a dead-end street, and they couldn't really park in front of his house or near his house. Because Clever is such a small town, they were being pulled over by the police and asked what they were doing there when they attempted to conduct physical surveillance They would sometimes think there was a narcotics transaction happening at Clark's house, and would drive by once or twice, but they couldn't make a habit out of this because they were concerned they would be noticed. Regarding the use of undercover agents or confidential sources, he testified that it is difficult to use them because they often don't have information divulged to them. It was not as easy to infiltrate the organization in this case as it typically is. They had one confidential informant, and no undercover officers because the informant told them that they wouldn't be able to introduce another person to Jason. There is no way to say how long it might take to get an undercover officer into a case; in this case, it wasn't going to happen. This investigation started in November, and by June of 2008, they realized they couldn't fully infiltrate the organization. All they had was Jason Clark, and they could not fully investigate their case without more information. They had infiltrated Jason Clark with the confidential informant, but not the organization. He believes they only had one controlled buy with Jason Clark. Agent Hooten testified that pen registers, telephone tolls, trap and trace devices, and subscriber information had proved helpful to an extent, in affording them information about Jason Clark and some of the people the confidential source thought were dealing with him. He agreed that they could have spent a long trying to use other investigative techniques. Normally, in a criminal investigation, he doesn't choose to seek a wiretap. Factors to be considered include the magnitude of the

4

organization, and the ability or inability to infiltrate it and prove the case. That determination, according to Agent Hooten, is not based on how long they have investigated a case. In this case, they had a lot of information about different people, but were not able to obtain enough evidence about any one of them, other than Jason Clark, to present an indictment or to have probable cause to make any arrests. The goal of the DEA is to fully investigate an organization, and to indict an organization, as high up as they can. In this case, merely indicting Jason Clark would not have accomplished this. He agreed that, even now, they do not have the supplier of the drugs in this indictment. Agent Hooten acknowledged that they did not apply for any search warrants prior to seeking the wiretap. They did not think a search warrant would accomplish their goals because a search warrant in the past had not been successful. They had some information that Jason Clark kept his drugs in a stash house, but they did not seek a search warrant because they had no idea where the stash house was. A search warrant would have just gotten them Jason Clark, and they wanted other people. Regarding grand jury investigative subpoenas, they regularly use these pre-indictment. In this case, he doesn't know what they would have subpoenaed. They did use a lot of investigative subpoenas in this case to subpoena phone numbers, but the information is limited because it only provides the number and the subscriber, but not who is actually using the phone. These do provide a little guidance. In a lot of cases, the use of a grand jury subpoena is limited. Regarding a trash search, he stated that drug dealers don't normally put drugs in the trash, based on his experience. Again, had he conducted a trash search in this case, he believed that it would have only yielded Jason Clark. Regarding the IRS investigation, Agent Hooten testified that, typically, an IRS investigation does not overlap with the DEA's case. In this case, they told the IRS to wait to start its investigation so as to not alert

5

any suspects. Agent Hooten testified that he did not believe that he specifically asserted that there were any dangers associated with normal investigative techniques in this case, but generally speaking, there could be.

Regarding the subsequent applications for extensions, the officer agreed that he referenced the fruit of the first wiretap in those applications. The officer testified that the results of the first wiretap were helpful in obtaining information and indicting several people in addition to Jason Clark. They sought a total of four wiretaps. As a result, they had arrests, money seizures, larger drug seizures, and more corroborating information. They did use other more normal investigative techniques after the first wiretap, as well as after the extensions. Agent Hooten testified that he has only gotten four wiretaps in the fourteen years he's been with the DEA. He stated that he could not say typically how long the DEA investigates before seeking a wiretap; in this case, it was six to seven months. He's seen cases take years and some take months.

Upon further cross-examination by counsel for defendant Parenteau, the officer reiterated that the DEA wanted to fully investigate the full organization. He agreed that he had been alerted that defendant Parenteau was involved by the confidential source, but that they did not conduct any surveillance of her house, do a trash search, seek a search warrant, track her vehicle, or attempt to buy any drugs from her. While they did not use normal investigative techniques with her, they did not find hard evidence regarding her involvement until after the wiretap. The officer agreed that after the first wiretap, they sought extensions to obtain more hard evidence, other than just people talking on their phones.

On redirect, Agent Hooten testified that this investigation is not concluded, and they are

optimistic that they will indict the source of supply in California. Regarding this case specifically, the officer testified that it was more difficult to conduct surveillance on drug deals in public because they felt that counter surveillance was being used. Ordinarily, they would try to find the target and follow them. But, in this case, Jason Clark used multiple vehicles. On one occasion, for example, they believed that Clark spotted them and quickly fled the scene, and they lost him immediately. They were told by the confidential informant that Clark had noticed cars he thought belonged to law enforcement, and that he had specifically taken a Corvette to elude them quickly. In another instance, they had information that Jason Clark and another subject were in a hotel counting a large amount of money. The DEA went to the hotel and saw the two arrive, and then leave very fast on motorcycles. They felt that this was an attempt to see if anyone was following them. He stated that they attempted surveillance on other individuals prior to obtaining the wiretap, but were not able to follow them successfully. The officer explained that to obtain a wiretap, law enforcement must have what is referred to as a "dirty call," which relates to drug-related matters or the sale of narcotics. [Tr. 46]. They would obtain this with a recorded confidential call and a follow-up controlled buy. They cannot get a wiretap without at least having this, which they had in this case. Regarding the use of pen registers and subpoenas for phone records, these techniques supplied them with phone numbers and the individuals who subscribed to the phones. But, in this case, the subscriber names were not necessarily the names of the persons using the phones. Regarding trash searches, Agent Hooten testified that there were additional problems at Clark's residence because often, the trash not being set out close to the curb. Additionally, he lived on a short, dead-in street, where the officers felt like they could easily be compromised. He explained that they could drive by the

residence any time of the day or night, and Clark would be outside working on one of his vehicles, or the garage door would be open. They felt it was risky to drive down the street because Clark was awake and moving around. He also testified that he considered this larger than a typical case in their office based on the amount of drugs Clark was alleged to be distributing, and the amounts of money involved. Regarding post-indictment information and cooperation, it was his testimony that this does not usually lead them to individuals who have not already been indicted. Regarding the extensions, Agent Hooten testified that they sought extensions to the first warrant because they were not able to meet their investigative goals through the first 30 days of the first warrant. The first warrant did not involve text messaging. When they applied for an affidavit for text messaging, it was very fruitful because Jason Clark constantly text messaged. He testified that it took more than one extension to establish a pattern of drug activity sufficient to acquire enough information regarding shipments of drugs and exchanges of money. It took about three to five weeks for this pattern to develop.

On re-cross examination, Agent Hooten was asked about a "dirty call." [Tr. 52]. He mentioned this in the affidavit. That was when the confidential source made a controlled purchase. This was prior to getting the wiretap. He agreed that they had some information about several people and some of Jason Clark's practices regarding his drug transactions, prior to obtaining the wiretap.

Defendants argue that the evidence obtained as a result of the wire tap interceptions, and the fruit thereof, were obtained unlawfully, and that all such evidence should be suppressed. They assert that the wire tap interceptions in this case were issued without a showing of necessity as required by 18 U.S.C. §§ 2510 et seq., and § 2518(1)( c).

The necessity requirement of § 2518 insures " 'that wiretaps are not routinely employed as the initial step in an investigation.' " United States v. Thompson, 210 F.3d 855, 858-59 (8th Cir. 2000) (quoting United States v. Maxwell, 25 F.3d 1389, 1394 (8th Cir. 1994)). To meet the necessity requirement, an application requesting a wiretap order must include "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous." 18 U.S.C. § 2518(3)(c); e.g., United States v. Jackson, 345 F.3d 638, 644 (8th Cir. 2003); United States v. Jones, 801 F.2d 304, 314 (8th Cir. 1986). In the case of drug conspiracies, '[i]f law enforcement officers are able to establish that conventional investigatory techniques have not been successful in exposing the full extent of the conspiracy and the identity of each coconspirator, the necessity requirement is satisfied." Jackson, 345 F.3d at 644-45.

Agent Hooten's affidavit states, with detail, the conventional investigative techniques utilized by law enforcement officers regarding an investigation into drug trafficking and money laundering activities by Jason Clark, the first-named defendant in this case. The investigation began in 2004, with the Combined Ozarks Multi-Jurisdictional Enforcement Team ["COMET"] and the Bureau of Immigration and Customs Enforcement ["BICE"]. BICE and the United States Attorney's Office ["USAO"] closed the case in 2007, without prosecution. Affidavit in Support of Application, ¶ 27. The methods in the initial investigation included a "knock and talk," ¶ 28, controlled purchases, confidential informants, interviews with cooperating individuals, and pen registers. ¶¶ 29-39. The current investigation, according to Agent Hooten, began with two intelligence reports, dated February 21, 2007 and September 17, 2007, in which Jason Clark was identified as being involved with distributing large amounts of

9

methamphetamine. ¶ 41. DEA conducted interviews with a confidential source who provided information regarding Jason Clark's methamphetamine distribution operation, which originates in California and/or Mexico. ¶¶ 42-46. The confidential source indicated that Clark utilizes a telephone to facilitate drug transactions, uses slang and coded words to disguise drug activity, as well as text messaging, and that he uses several vehicles in an attempt to elude law enforcement. ¶ 46. The affidavit states that on one occasion, Clark used a vehicle occupied by a white female and small child during a drug transaction to conduct counter-surveillance, and that Clark eluded police in a vehicle traveling over 100 miles an hour. ¶¶ 47-51. The methods of investigation have included, in addition to surveillance and the confidential informant, a pen register and Trap in Trace. ¶¶62 and 64.

    Agent Hooten attests that the wiretap was necessary because normal investigative techniques had been tried and failed to fully achieve the objectives of the investigation, or appear reasonably unlikely to succeed, or are too dangerous to be tried. ¶ 90 He also attests that the wiretap was necessary to enable the government to achieve the objectives of the investigation, which are to obtain direct evidence of the full scope, extent and personnel of the narcotics trafficking conspiracies under the hierarchy of the organization; the identity and role of all suppliers of narcotics to the identified conspirators; the identity and role of the main customers of the identified conspirators; locations where narcotics are stored prior to distribution and the organization's method of distribution; and the management and disbursement of proceeds generated by narcotics trafficking by the organization. ¶ 91.

    The affidavit indicates the difficulties law enforcement officers encountered and explained why the investigative methods that were attempted failed to discover the full scope of

10

the conspiracy. For instance, physical surveillance, though useful in identifying some of the activities of the target subjects, would be largely unsuccessful to fully identify the roles of the members of the organization and the nature of their involvement because the target subjects appeared to be aware of the presence of the officers and law enforcement surveillance, and are skilled in counter-surveillance and evasive driving techniques. Based on his experience, he stated that "physical surveillance alone will not be successful in developing prosecutable evidence against the Target Subjects without recorded conversation between them." ¶ 93. Agent Hooten stated in the affidavit specific evasive actions such as driving at high rates of speed, using back streets, and utilizing several different vehicles in one day to elude law enforcement. ¶ 94. He also indicated that defendant Jason Clark's residence is on a dead-end street, which makes drive-by surveillance and parked surveillance impossible, and that physical surveillance does not reveal the roles and identities of more senior members of the organization, who generally participate through the use of telephones and text messages. ¶¶ 96-97. Agent Hooten attested that pole cameras and other optical devices have limited efficacy because they are static and do not reveal the content of any conversation, nor has he been able to find any good locations to set up a pole camera. ¶¶ 99-101. The use of tracking devices was also rejected because of different vehicles being used, the short battery life, the risk of detection, and the lack of effectiveness. ¶ 102. Agent Hooten attested that although the confidential source had been used to purchase a limited amount of methamphetamine from defendant Clark, the purchase did not reveal information regarding the sources of supply, the information has been diminishing because of Clark's involvement with an unidentified female, and it is highly unlikely the confidential sources and/or undercover agents would be capable of reaching the investigation's

objectives by being able to infiltrate the top levels of the organization. ¶ ¶ 106-108. He also attested that a pen register and trap and trace had been activated on the target telephone, which has registered 17,100 calls; that defendant Bryant has three telephones subscribed to him with 1040 contacts with the target telephone; defendant Millsap has logged 428 contacts with the target telephone; and defendant Parenteau has logged 306 contacts with it. He states, however, that while this information has proven useful, this is a limited investigative technique because it does not establish the identities of the persons called or the contents of the conversations. Additionally, trap and track devices and toll records are similarly limited. ¶¶ 110-115. Agent Hooten also attested that search warrants have not been issued in the DEA investigation, although there have been attempts to obtain warrants. He stated that the temporary locations for the drug transactions make it difficult to successfully execute a warrant; that a warrant would not provide enough information about the organization; and that a search warrant served prematurely would alert the target subjects. ¶¶ 116-117. Further, he attested that interviews, grand jury subpoenas, and grants of immunity would not be useful, would alert target subjects, and in the case of immunity, would not be appropriate. ¶¶118-121. In the case of trash searches, he stated that law enforcement officers would risk detection if attempts to search Jason Clark's were undertaken, and further, that trash searches would not be productive because narcotics traffickers avoid placing incriminating evidence in their trash. ¶¶ 125-126. Finally, it was Agent Hooten's statement that while an IRS investigation or obtaining credit reports could be helpful, it would be unlikely that the information would lead to the identification of the target subjects' sources of supply, transporters, financiers, distributors, and customers. ¶ 127.

Defendants stressed in their briefs in support of their motions to suppress, as well as at

the hearing before the undersigned, that many of the reasons Agent Hooten gave in the affidavit for the ineffectiveness of traditional investigative techniques are common to most drug conspiracy investigations. The courts have found, however, that this fact does not necessarily preclude a finding of necessity under § 2518(1). United States v. Thompson, 210 F.3d 855, 859 (8th Cir. 2000), citing United States v. Milton, 153 F.3d 891, 895 (8th Cir. 1998). The Thompson court reiterated its holding from Milton in which it found that, even if an affidavit's assertions that normal investigative techniques are inadequate "might appear boilerplate, the fact that drug investigations suffer from common investigative problems does not make these problems less vexing." 210 F.3d at 859, citing Milton, 153 F.3d at 895. Therefore, even if investigative problems might appear to be unremarkable, necessity can be found if "the affidavit describes with particularity how the investigative techniques traditionally used in drug investigations would not likely be successful [in this drug-based conspiracy]." Thompson, 210 F.3d at 859.

The affidavit filed with the initial wiretap application in this case explains at length and with particularity why traditional investigative techniques have failed to provide needed information or are unlikely to succeed if tried in this case. For example, the affidavit delineated the difficulty of placing other confidential informants or undercover officers into the conspiracy; the ineffectiveness of physical surveillance; the surreptitious conduct of Jason Clark and others; and the limited utility of trash searches, pole cameras, and/or search warrants. Based on all of the above, the Court finds that the an application requesting the wiretap order included a full and complete statement as to whether or not other investigative procedures had been tried and failed or why they reasonably appeared to be unlikely to succeed if tried or to be too dangerous. As was the case in United States v. Jackson, the focus of the investigation was the conspiracy, not

13

any individual defendant. The government adequately established the need for the wiretap to discover the scope of the conspiracy and to enable the government to seize drugs and money used in drug transactions. After careful review, the Court finds that the requirements of § 2518(3)(c)were met in this case. See Jones, 801 F.2d at 314-15; United States v. Daly, 535 F.2d 434, 438-39 (8th Cir.1976); United States v. Davis ,882 F.2d 1334, 1343-45 (8th Cir. 1989). Because of this finding, it is also the Court's opinion that the extensions to the wiretap were legally acquired. Therefore, it must be recommended that the motions to suppress wiretap evidence on the ground that the necessity requirement has not been met should be denied.

After making an independent review of the record and the applicable law, the Court finds that it must be recommended that defendants' motion to suppress wiretap evidence be denied. Based on a full review of the record, the Court is satisfied that a finding of necessity has been properly established by the government.

Even assuming, however, that the government failed to establish necessity for the wire tap interceptions in this case, the Court finds that the good faith exception enunciated in United States v. Leon, 468 U.S. 897, 922-23 (1984), would apply. It is clear that Agent Hooten relied in good faith on what he believed to be a valid wire tap order and extensions, which were reviewed and signed by a neutral district judge. There is nothing to suggest that the affidavit was so lacking in indicia of necessity or probable cause that the Leon good faith exception should not apply. United States v. Moore, 41 F.3d 370, 376 (8th Cir. 1994) (the Leon principle applies to § 2518(10)(a) suppression issues), cert. denied, 514 U.S. 1121(1995).

For the foregoing reasons, it is, pursuant to the governing law and in accordance with Local Rule 72.1 of the United States District Court for the Western District of Missouri,

RECOMMENDED that defendants' Motion to Suppress Evidence should be denied.

        /s/ James C. England
        JAMES C. ENGLAND, CHIEF
        United States Magistrate Judge

Date: 11/4/09